In Hamilton vs. Hamilton, the opinion of the court was delivered by
Dunkiist, Ch.
The court is of opinion, that in order to succeed in their motion, the appellants must present a case which would entitle them to the rescisión of an executed contract. It is necessary, then, to inquire whether, on principle and precedent, the circumstances developed warrant the interference of the court. The brief details the facts, and they are substantially sustained by the affidavits which accompany it. A sale liad been ordered by the Court of Chancery, for the .satisfaction of the liens on Rice Hope, a plantation on Savannah river. The debts and priorities were established and fixed by the decree directing the sale. The plantation belonged to the trustee of Mrs. Hamilton, whose right had been judicially declared to be subordinate only to those of the lien creditors. Among these liens were two mortgages held by the Bank of Charleston, which were recognized and protected by the decree. The Bank had also a demand against Gen. Hamilton, amounting to about $L6,000, for which they had no claim whatever on the land, any more than if it had been the property of a stranger, and which is described in the decree as their “ uncovered debt.” The trustee of Mrs. Hamilton was desirous of becoming the purchaser of the property at the master’s sales; and, after a negotiation, as the witness stated, of more than a twelvemonth with the Bank, it was finally agreed that the Bank would advance the money to enable the trustee to buy the land, upon condition that he would secure the uncovered debt by a mortgage of the property. Up to one o’clock on the day before the sale, “ it was thought,” says the witness, “ both by Gen. Hamilton and the Bank of Charleston, that there would be no bidders for the plantation for any thing like its value, and that the parties holding mortgages would not be likely to bid much, as their,claims were comparatively small, and the difficulties of settling Savannah river! lands very great, in consequence of the climate.” The mortgage of Dr. North, securing *380 a debt of $17,000, was junior to those of the Bank of Charleston, of Barquet and of Timothy, which together amounted to $32,000. In order to reach and satisfy the lien of Dr. North, it was necessary that the land should sell for about $50,000. It was proved that Dr. North, aided by Mr. Adger (on whom there was a contingent liability for North’s debt) intended to bid the plantation to that amount. It was also proved, that about one o’clock on the day previous to the sale, both the bank and the trustee of Mrs. Hamilton were informed that there would be competition. Upon further inquiry it was ascertained on the day of the sale, that the competition was on the part of Dr. North. In consequence of this information, the trustee went to the agent of Dr. North. “ The object,” says he, “ in going, was to prevent the Norths from bidding, as I was well satisfied that if they did not bid, the uncovered debt would be secured — if they did bid, it would not be secured.” The witness, Mr. Gourdin, was also a Director of the Bank of Charleston, and was one of the committee of the Bank appointed to 'arrange the matter. A negotiation accordingly took place, and an arrangement was ultimately made, by which, if the land did not sell for more than $3.0,000, it was to be bid off by the Bank, North’s debt was to be secured by a mortgage of the property, to come next after the mortgage debt of the Bank, and his competition was to be withdrawn. The plantation was to be, in fact, held by the trustee of Mrs. Hamilton, who, after satisfying the mortgages of the Bank and of Dr. North, was to apply the net proceeds of the crops towards the discharge of the uncovered debt of the Bank of Charleston. The sale took place, and the plantation was knocked down to the trustee of Mrs. Hamilton for $11,000. The property was proved to be worth about $40,000. The direct effect, then, of the arrangement, was to withdraw from the market a competitor who was prepared to bid $50,000, and the result was that property, intrinsically worth $40,000, was knocked down to one who was a party to the arrangement, for $11,000. The price bid is insufficient to satisfy the mortgages of the Bank, and if the sale stands, Barguet and Timothy lose their debts. These are not all of the facts of the case, but they are all which it is deemed necessary to repeat, in order to render intelligible the judgment of the court.
The principle which governs all sales at auction, is that there should be full and fair competition. Any agreement, the object and effect of which is to chill the sale and stifle competition, is *381 illegal) and the party to the agreement can derive no benefit from the sale. Such is the doctrine recognized by the text writers, and well sustained by the authorities. Sir E. Sugden says that; in sales before the master, “although the report be absolutely confirmed, and the purchaser entitled to demand a conveyance, the sale will be set aside if the parties have' agreed not to bid against each other.” Sug. Vend. 38. Sowell understood is the rule in England, that in Fuller vs. Abrams, 3 Brod. Bing. 116, where, at a public sale by the assignees of a bankrupt, the purchaser proclaimed to the by-standers that he had a claim against the owner .of the property, by whom, he said, he had been ill-used, and by thus exciting their sympathies,-obtained the property at one fourth of its value, the Court of Common Pleas declared themselves clearly of opinion that a sale under these circumstances could not be supported. “Agreements,” says Mr. Justice Story, § 293, “ whereby parties engage not to bid against each other at a public auction, especially in cases where sticlv auctions are directed or required by law, as in cases of sales of property under execution, are held void; for they are uncon-scientious, and against public policy, and have a tendency injü-riously to affect the character and value of sales at public auction, and mislead private confidence.”
In ordinary auctions, the owner of the property is free to afct. He may sell or withdraw his estate from the auctioneer’s hammer. According to the authorities, he is even permitted to employ a bidder, who may prevent the sale below a limited price. But in judicial sales, no such option is allowed. The sale is positive, is generally against the will of- the debtor, and not un-frequently, against the desires and interests, of many of the creditors. No safeguards, which the law can interpose, do or 'will prevent the sacrifice of some interests, but all should have the chances of prbtectiom that are affordedrby free competition. In Jones vs. Caswell, 3 Johns. Cas. 30, Chancellor Kent, (then a Judge of the Common Pleas,) agrees with the court in the “importance that sales at auction, and particularly on. legal process, should be conducted with good faith, and without prejudice to any party;” that “the attempt to silence bidders is against public policy, and the interests of the original debtor, whose property was liable to be sacrificed by such combinations.” And, reiterating the rule in Troup vs. Wood, 4 J. C. R. 254, he says, “ the law has regulated sales on execution with a jealous care, and a. combination to prevent competition is contrary to sound *382 policy. It operates injuriously both to the debtor and his remaining creditors, by depriving the former of the opportunity of obtaining a full equivalent for the property which is devoted to the payment of his debts, and opens a door for. oppressive speculation.” The interests of the creditors are in equal jeopardy with those of the debtor, and they may be equally incompetent with him to guard against the ruinous consequences of stifled competition. Barbara Barguet and the representative of Timothy might have attended the sale of Rice Hope, and been the witnesses of the sacrifice, but they had no power to avert it. They could neither pay twenty-two thousand dollars to the Bank of Charleston, nor become the proprietors of a Savannah river plantation. They sought the payment of their debt, and the law secured to them, in the language of Chancellor Kent, the opportunity of obtaining a fair equivalent for the property devoted to the payment of that debt, which is afforded only by free competition. Judge Spencer says in Thompson vs. Davies, 13 J. R. 113, “a public auction is open to every one, but there must be no combination among persons competent to bid, silencing such bidders, for the tendency to sacrifice the debtor’s property is inevitable.” “ The principle is of too salutary a nature to permit any refinements which tend to sap or subvert it.” It may be added that these principles depend for their vindication on no local statute, on no peculiar usage. They have a much higher origin, and have been promptly recognized in every State where it has been foqnd necessary to consider them. In North Carolina the subject has been very ably discussed by Mr. Ch. J. Henderson. In Smith vs. Greenlee, 2 Dev. 128, the principles are thus, condensed : “ A sale at auction is a sale to the best bidder, its object, a fair price, its means competition. Any agreement, therefpre, to stifle competition, is a violation of the principles on which the sale is founded. It not only vitiates the contract between the parties, so that they can claim nothing from each other, but also any purchase made under it, their claims against the vendor being weaker than those against each other — policy alone forbidding that the last mentioned should be enforced, but both policy and justice uniting to condemn the former. If this be the rule with regard to auctions instituted by private individuals, a fortiori should it be as to those public auctions instituted by law for great public purposes, such as execution sales, where the object is to secure the creditor, if possible, the satisfaction of his debt, and, at the same time, to obtain for the debtor a fair *383 price for his property. Men may, from the very worst of motives, both towards the creditor and the debtor, abstain from bidding, without incurring any legal censure. They have a right to abstain from action — they may act or not, at their pleasure; but, if they do act, they must do it fairly. They cannot claim to themselves any benefit from a. sale, the first principles of which they have violated, fair competition being the very essence of an auction sale. An agreement not to bid, for the purpose of paralyzing competition, vitiates the sale so that no party to such agreement can claim any benefit from it. The sale is void at law. _ Thére is no part of the transaction,” concludes the Judge, “ which should be preserved.”
It is shown, however, in that, as in other cases, that persons may, properly, unite for the purpose of making a bid among themselves, where no one of the associates was able to purchase, or desired to own, the entire property exposed for sale. The effect of such an agreement is to advance the object which the policy of the law favors, a fair price to the parties interested in the article sold. In Phippen vs. Stickney, 3 Met. 385, where the general rule is examined and approved by the Supreme Court of Massachusetts, this distinction is noticed and illustrated. The court say that, “after an examination of .the adjudged cases, they cannot judicially declare that every contract between two or more individuals, in which it may be stipulated that one is to be the purchaser for the joint benefit of himself and another, and that the other is not to interfere with his bidding, shall be held void as a violation of the rights of the vendor and as against public policy, merely because he, who seeks to enforce the contract, may have been thereby induced to abstain from bidding. Cases may readily be imagined, and are of frequent occurrence in sales of large magnitude, where two or more do unite, and are enabled to become purchasers, when neither of them could otherwise have participated in the bidding. By such an association the interest of the vendor as well as that of the vendee will be directly advanced.” But they declare that the doctrine of invalidating such contracts applies “to all combinations having for their object to stifle fair competition at the biddings, with a design of becoming the purchasers at a price less than the fair value of the property.” The current of decisions is so uniform, and the general principle so clearly announced, that it is not deemed necessary further to consider its validity, or the importance of preserving it. It is proper to notice the consideration, which was *384 so strongly and so confidently urged, as rendering the rule inapplicable to this case. The argument was that this was not a combination to paralyze, but to promote, competition — that the trustee agreed to pay a much larger price than the highest bidder, Dr. North, would have offered. But this does not meet the policy of the law, nor satisfy the exigency of the rule. He did not agree to pay to the right persons. The object of the law is to secure a fair price to those interested in the property. If a purchaser at sheriff’s sale silences competition by buying off the bidders, and thereby has the property knocked off to him at one-fourth its value, it may be that the speculation will prove unprofitable — he may have agreed to pay, by this complicated arrangement, more than the property was worth, and more than the most enterprizing bidder would have offered — but this affords no relief, and is no reply to the defendant in the proceedings, or to his execution creditors. The inquiry of the law is, not whether the purchaser made a good or a bad bargain, but whether the persons interested in the property had the benefit of a full and free competition. If mot, the sale is void. The whole transaction is void ; and can be enforced by none of the parties to it, even against each other. The purchaser of Rice Hope agreed to pay a full price by assuming to discharge the debt of a third person to the Bank of Charleston. The land was not bound for that debt in any way — and the mortgagees of Rice Hope — those interested in the sale, derived no benefit from that payment, or from that part of the arrangement. In judicial sales this court has established the principle that no inadequacy of consideration, however gross, should impair the validity of the contract. In Young vs. Stockdale, Rice Eq. 3, the land was bid off at sheriff’s sales at one-fiftieth part of its real value. There was no suppression of biddings, no unfairness, and the purchaser was held entitled to the benefit of his contract. This was due to the public — to the security of purchasers under judicial process. But, while thus sternly protecting its own sales, it is the duty of the court to take care that none of the principles of public sales are violated. Men, intending no injustice, desiring only to protect their own interests, may misapprehend, or forget, or disregard those principles. It is the province of courts to expound and enforce them. “ They are too salutary” — in the language of Judge Spencer — “to permit any refinements which have a tendency to sap or subvert them.”
It is ordered and decreed, that the sale of Rice Hope made by *385 Mr.-Gray on the 3d January, 1844, be set aside and annulled, and that the cause be remanded to the Circuit Court of Equity for Charleston District, to make such order, at the next sittings thereof, for the sale-of Rice Hope, and the execution of the decree pf March, 1843, as to the said court rnay seem just and proper.-
JohNson, Ch. and O’Neall, Butler, Wardlaw and Frost, JJ. concurred.
Richardson, J. absent at the argument from indisposition.
In the case of Martin & Walter vs. Evans the opinion of the court was also delivered by
. Dunkin, Ch. For the, reasons stated in the decree, as well as those in Hamilton vs. Hamilton, the court is of opinion that, on the principal ground of appeal,- the motion should be dismissed.
Butin regard to the conveyance of 1827 to Thomas Evans, Junior, the court thinks the decree should be reformed. The deed was recorded soon after its date. The.title never vested in Thomas Evans, Senior. But it was a gift of so much money to his son. None of his then existing creditors now seek to impeach the transaction. It is not certain that any such exist. He was indebted, however, at the time of .the gift, arid he did not prove to the satisfaction of the Chancellor that he had, at any time, ceased to be in dqbt.
The. question then is presented whether, after a lapse of thirteen or fifteen years, a son shall be called on to refund a sum of money given to him by his father under the circumstances detailed iri the decree. In Partridge vs. Gopp, 1 Eden, 163, Lord Northington, with great reluctance, and against his first impressions, held the child accountable, but it appears from the note of Mr. Henley that the decision was not very satisfactory to the profession. It must be remarked too that'.the Lord Keeper thought there were circumstances in that transaction, which, as he expressed it, “seemed to. smell strong of fraud and experiment.” There was no doubt of the good faith of Thomas Evans, Sr., in this matter. Considering his means and the extent of business - in which he was engaged, the gift to his son was inconsiderable, and might well be made-with the purest motives. It. is not necessary to determine more than the case before us, arid the court is of opinion that, under the circumstances, the son was not responsible to the complainants ; and that trié decretal order subjecting the Cat-fish lands to the payment of their demands must *386 be reversed. In other respects the decree of the circuit court is affirmed, and the appeal dismissed.
JohnsoN, Ch. and O’Neall, Butler, Wardlaw and Frost, JJ., concurred.
Harper, Ch.
If it were of any importance to the ease, I should think it singular to contend, that the case of Hamilton vs. Hamilton is to be considered as if it were a bill by the purchasers of the property for a specific performance of the contract. Certainly the intermediate mortgagees, as stated in the circuit decree, were the actors in the application which was heard and determined. The purchasers were contented. Some confusion of ideas seems to have arisen from the irregular manner in which the case was brought before the court. This was by the consent of all the parties, who were anxious to have their rights determined on: but I think the precedent a bad one, and hope it will not be followed in any other instance. But suppose the purchasers had not consented. Then, after giving the mortgagees a reasonable time to file their bill, the master would as of course have executed a conveyance in pursuance of his official duty. Or if he had refused to do so, and the purchasers had taken out a rule against him, the court would as of course have made the rule absolute, unless upon sufficient cause shewn to the contrary. Suppose him to have shewn for cause the facts and circumstances which are in evidence, as stated to him on the part of the mortgagees, (though it would be singular that he should shew for cause the statements of third persons,') could the court have proceeded to hear evidence and determine the merits of the cause in such a proceeding 1 The object of a rule is to compel the officers of the court to do their duty, when there is no dispute about facts ; certainly not to try and determine litigated issues. This forms a distinction between the case of contract made with an individual and one made with an officer of the court, who is subject to its control by a summary proceeding. Such a return of the officer would be no sufficient cause, as the parties might fil’e their bill and try their rights in a regular manner.
The only question whicli seems to have been regarded as material is the inducing of a person not to bid at a sale by auction. It seems to be understood that there is some rule (if rule it may be called, for I really have not perceived any definite riile on the subject suggested or contended for) avoiding purchases made under such circumstances,- as contrary to public policy. I will venture to say that the utmost that Can be made of the cases is, that *387 such an act is prima facie evidence of fraud in the purchaser, unless explained. To such a rule there can be no objection. Indeed the natural inference is that the party so deterring bidders, does it with a view to cause a sacrifice of the property and to procure unjust gain to himself. This would be actual covenous practice, as to the owner of the property, and, according to circumstances, might perhaps be so as against creditors, — for the rule; even as I have stated it, cannot be of universal application as to creditors.
The case of Jones vs. Caswell, 3 Johns. Cas. 29, is evidently the foundation of the American cases, which were cited, on the subject. Yet if we examine the case itself, apart from the dicta, I cannot perceive that it bears at all on the matter we are considering. In that case (to state it shortly) the defendants had purchased a tract of land, bound by a judgment of which they had no notice. The land was advertised for sale, and the defendants applied to the owner of the judgment and offered to pay it off if he would not bid against them. He refused, unless they would also give him their notes to the amount of one hundred and fifty dollars, which they did. On these notes the suit was brought. Now, whether they were deterred by ignorance or whatever cause, it is plain that the defendants had nothing todo but to pay off the execution in the sheriff’s office and their title would have been perfect. If there was any fraud it was not on the sale, but on the defendants, by taking advantage of their ignorance or alarming their fears. If the plaintiff had bid more than the amount of his execution, he would have lost his money. If, by affecting to bid, he had induced the defendants to bid more, he would have been guilty of, at least, a moral fraud on them. No bidder was deterred who had any right to bid.
The case of Thompson vs. Davies, 13 Johns. R. 112, very fully sustains the decree in Martin & Walter vs. Evans. That case purports to be decided on the authority of Jones vs. Caswell, by Chief Justice Spencer. With the utmost deference for that very eminent Judge, I must be permitted to say that I do not perceive the grounds of law, justice or reason on which it can be supported. It is supported by the case of Jones vs. Caswell, as we have seen. The plaintiff had a senior, and, in effect, the defendant a junior execution against one Doughty, They had also been under liabilities for Doughty as endorsers, which the plaintiff had discharged. The defendant had alsp *388 other claims against Doughty to a considerable amount. Real and persona] estate of Doughty was levied on under execution, and it was agreed between them that the plaintiff should bid for the personal estate to the amount of his execution 5 that he should give his note to the defendant for $225, part of the- liability as endorsers above mentioned, (as it is stated) which he did, and afterwards paid; that defendant should bid off the real estate and afterwards sell it to the.best advantage, and if it should sell for more than enough to satisfy his own demands, to reimburse plaintiff the $225. Plaintiff did bid off the personal estate to the amount of his execution, which was more than its value. Defendant bid off the real estate and afterwards sold it at a large advance.. The action was for the $225. Here was a combination, not to sacrifice the property, but to make it, both real and personal, sell higher than it otherwise would have done, and to apply the proceeds to the payment of debts. Yet it was held that, however fair the intentions of the parties may have been, the agreement was void on ground of public policy, The agreement was for the benefit of the owner of the property ; no other creditor's appear to have been in question, and I suppose the defendant was allowed to retain the whole of the advanced price for which he sold the land. It only seems to., me that, by the aid of the court, he consummated a fraud on the plaintiff.
I do not think it necessary to examine the other New York cases which were cited. Some of them were cases of the grossest actual fraud, as Troup vs. Wood, 4 Johns. Ch. 228, in which there was a combination to sacrifice a large property and to purchase it at a merely nominal price. The same dicta are répeat-' ed, that an agreement not to bid at a public sale, is void, ás against public policy and tending to fraud.
The decisions of New York were then of great weight in the other States, and deservedly so from the ability of their Judges. The decisions in question have been followed to a certain extent in other States, but in no instance' without qualifications and ex-céptions. And what, was the nature of these- exceptions1? It. will upon examination be found uniformly this, — that where the circumstances are such as shew that there was no actual fraudulent intention to occasion a sacrifice of the property, such ah agreement-may be good ; leading to the conclusion I have before expressed, that it can only be regarded as prima facie evidence of fraud. Such was the case cited from North Carolina of Smith vs Greenlee, 2 Dev. 126. The -Chief Justice, Henderson, put varioiis cases in which such an agreement may be good, as where *389 the property was too large for either of several bidders, but each desired a part, they might agree that one should bid for the whole, &c. The matter seems to have been put upon its proper footing in Massachusetts, by the case of Phippen vs. Stickney, 3, Metc. 384. That was a case in which one party desired to have one portion of the property, which was to be sold entire, and the other another portion. The agréement that one should bid for both, was supported. The New York cases were cited. It was held by Mr. Justice Dewy to “ embrace within the rule all fraudulent acts and all combinations, having for their object tó stifle fair competition at-the biddings, with the design that they should become the purchasers at a price less than the fair value of the property.”
The only English case cited Was that of Fuller vs. Abrahams, 3 Bred. & Bing. 116; 7 Eng. C. L. R. 371. At an auction, a person requested the bystanders not to bid, as he had a claim on the owners, who had used him ill. They did, in effect, abstain from bidding, and he purchased the property for one fourth of its value. Here was a combination by which the property was sacrificed for less than its fair price.
Then the question in this case is (supposing that any bidders wére deterred) whether the matter has been sufficiently explained. All the circumstances are before us, and we must determine whether there was or was not actual fraud. What act was there of fraudulent character, as- respects the intermediate mortgagees? Is the arrangement between Dr. North, who did not wi'sh to bid, and Mr. Adger, evidence of a fraudulent intention to injure the mortgagees? Why, the whole scope and purport of it was, if carried into full effect, to make them secure beyond the power of casualty. Instead of deterring a bidder, it was to bring a new bidder into the field of competition. Then as to the arrangement between the Bank and Mr. Adger and Dr. North. From the estimated value of the plantation, the strong probability at that time was that it would’ sell for more than $22,000. In that case, the agreement .between Dr. North and Mr. Adger would .have held good, and - the mortgagees might have been still secured. This is -no evidence of any injurious intention towards the mortgagees, nor, so far as we can see, has it produced any'injurious effect. Dr. North would of course bid off the land as low as possible. The agreement to bid $50,000, was of course understood, if it should . be rendered . necessarry by competition at the sale. Dr. North (or fhé gentleman repre- *390 seating the parties who were interested in the bond in his name) knew the extent of the Bank’s liens. Without any agreement, it would have bid high enough to cover these, and had no inducement to bid more. If, without any agreement, it had bid to this extent, and Dr. North had made a nominal advance on that bid, the land would have been knocked down to him, and these mortgagees would have been equally defeated. This might as well be called a fraud on the mortgagees, for if he had bid up to the whole amount of his debt (which the parties seem to think he was bound to do) he would probably have lost his debt, and been compelled to satisfy these mortgagees. Can it make any difference that the Bank was bound by its agreement to bid to this extent? Then as to the arrangement by which the Bank agreed to extend its bid to $30,000. Can this be regard-as a fraud on the mortgagees ? It was to secure the payment in toto of the demands of one, and a considerable amount on those of the other. It was to create competition to a certain extent — certainly not to prevent if; still leaving Dr. North’s arrangement to be carried into effect, if competition should carry the land beyond the proposed bid. If it did not, no injury was done. I can lay my hand on no fact or arrangement, which, at the time it occurred or was entered into, was not apparently calculated to add to the security of the mortgagees.
The case seems to be argued on no distinct and palpable ground or grounds of fraud, public policy or mistake; but it seemed to be thought that mingled together, they might make out a case for relief. Undoubtedly fraud is contrary to public policy, and relief will be granted in cases of mistake. But the truth is, that the only ground for the mortgagees is this, that debts to which they had a priority have been secured in preference to theirs, and they cannot but imagine there must be some way or other to correct this supposed anomaly. As I have said in the circuit decree, in Hamilton vs. Hamilton, “ suppose that the Bank and the owners of North’s bond, speculating on the chances of intermediate mortgagees failing to attend the sale, or their being unwilling to bid, or from their circumstances unable to purchase, had entered into the agreement, in such event, to bid off the property, as they have done, so as to gain the priority, which they have gained, without doing anything to mislead or deceive the parties, would there have been any thing fraudulent in this?” I will venture to say that no case can be found in the books — certainly none has been produced to this court, in *391 which a bona fide creditor has contrived to obtain satisfaction or security for his debt, that he has been deprived of his advantage, without some actual covenous practice on the party alleging himself to be injured. One creditor prosecutes his suit, perhaps with much trouble and expense, but when he is on the eve of obtaining his judgment, another bona fide creditor obtains from the debtor, .security or satisfaction for his debt; this cannot be impeached ; though this seems to be taking a hard and injurious advantage of the suing creditor. Or if after judgment and execution, he can obtain money or choses in action, these cannot be taken away from him. Yet the only fraud attempted to f>e imputed, is the design on the part of Dr. North to secure his debt, and of the Bank to secure its uncovered debt.
The truth is, however, that in legal contemplation, Mr. Cru-ger, the trustee of Mrs. Hamilton, or young Mr. Hamilton, was the purchaser. They had nothing to do with the arrangements which are supposed to have deterred bidders, and their only fraud was in consenting that the land should stand encumbered with the debts of Gen. Hamilton to a greater extent than it was before.
Then as to mistake; it is clear that the only mistake was that the parties took up the spontaneous impression, without any cause for it, except that Dr. North was the last incumbrancer, that he would bid at the sale. Indeed, they had rather cause for thinking the other way; for the land was so deeply incumbered before reaching the incumbrance of Dr. North, (according to the evidence about its full value) as to render it almost nugatory for him to attempt to secure his debt, or any material part of it. And it seems no such attempt would have been made, but for the arrangement with Mr. Adger. Neither this nor any other of the subsequent arrangements were communicated to the mortgagees, and could not have influenced their conduct. I see no footing on which this case can stand, unless it be laid down as a general rule, that in every case of several incumbrances, the last in-cumbrancer is bound to bid high enough to secure all those who have a priority over him.
I should hardly think it necessary to notice the ground taken, that the transaction in question operated as a fraud on the decree of the court, which directs the incumbrances to be paid off in a certain order, had it not been urged with apparent seriousness by able counsel. When the court directs property to be sold for the satisfaction of incumbrances, in their order, it means, *392 oí course, if the property shall sell for enough to satisfy them all. But it is said the price adjudged to have been paid is $60,-000, instead of $11,000 bid at the sale ; and you cannot assume one price for one purpose, and another price for another purpose. This can scarcely be called a fallacy — certainly it is not a- plausible one. Yet the Bank .would have paid exactly the same price it has now paid. - The order means the price which shall be bid at the sale. This would be to open the whole case. If, on equitable principles, such as have been considered, the parties can get at that price, no doubt their .debts will be satisfied. But if not, and the transaction be fair, it does not concern them what price the purchasers may have paid to third persons. If the Batik had bid off the land for $11,000,,and without any concert or arrangement had then consented, from whatever motive, that it should stand pledged as it now is, could this be called a fraud on the decree of the court, or give the mortgagees a right to hold the land still subject to their incumbrances ?
' It is said, however, that it was bid off in pursuance of concert and arrangement. Very well.; if there was any thing unlawful or fraudulent in that arrangement, it may be invalidated and the sale ,set aside. But if not, the case is the same with that I have first supposed,. . If in any case of such decree, the first incumbrancer, having, purchased the property at a' low price, should, from- motives of conscience or humanity, pay a further price to the owner, or should choose to pay off the junior of several incumbrances, how could the intermediaté incumbrancers entitle themselves to the additional price so paid?
It is in reference to this part of the case, that the commentary of Judge Story was referred to, in order to show his disapprobation of the doctrine of tacking, as being inequitable in its operation, and his impression that qui prior est tempore potior est jure would be the proper rule. With deference to that learned commentator, I tjiink the rule was properly adopted, and of necessity, and that there is nothing inequitable in it. The doctrine is considered by Lord Hardwicke in the case of Wortley vs. Birkhead, 2 Ves. 573, referred to by Professor Story. He thought it rightly settled, but adds, that it was so “ by the particular constitution of the law of this country.” It must be recollected that at law, in England, a mortgage is a conditional sale, and after condition broken, the estate of the vendee was absolute. It was a high exercise of authority on the part of courts of equity to divest him of his legal title, and regard it *393 only as a security. If the mortgagor himself were coming to redeem, and the mortgagee had afterwards advanced him money, or otherwise created a debt not secured by the mortgage, there would be an obvious equity for him to say to the mortgagor, the property is mine, absolutely, by law; you may redeem — but only on condition that you pay me every thing you owe me.' The case I think is not at all different with respect to subsequent in-cumbrancers, where.the owner of property (the first mortgagee) had. no notice at the time,he gave the new credit.
B gives credit to A, and takes a security, say a bond. A month or a year afterwards, C also credits A, knowing nothing of B’s claim, and takes his note ; what is there in justice or equity, to give one of these claims a preference over the other, or to prevent the junio,r creditor from obtaining satisfaction or security, though to the disappointment of the other ? The court has adopted the maxim, qui prior est tempore potior est jure, as a rule of convenience, and because it is necessary to have some rule on the. subject — not that there is any inherent right or equity in favor of one claimant rather than another. Indeed there are cases, and these I think not of unfrequent occurrence, where, in justice and conscience, the junior creditor ought to be preferred; though there are. not sufficient grounds for the court to interfere in his favor. Equity, when at liberty to. do so, inclines to put all debts on an equality, without reference to rank or date. But if the junior creditor can obtain a confession pf judgment or- a mortgage, what is there in equity to deprive him pf his advantage '? So in. the case of a junior mortgagee., who buys in the first mortgage, he is clothed with all the equities of the first mortgagee ; having no notice of the intermediate mortgages at the time he advanced his money or gave credit. It .makes no difference that the junior mortgagee had notice of the intermediate incum-brances at the time he purchased the elder; which is the common case; he had a right to protect himself. He purchased and paid his money, with a view to the security of his debt, amj in justice and conscience, he had a right to, take that security; as much so as a simple contract creditor has to take a judgment or mortgage, to the prejudice of an older specialty creditor.
There is no case in which the court has ever acted on the maxim,. qui prior est tempore, potior est jure, where one of the claimants has the legal estate. The distinction is pointed out by Lord Eldon, in Maundrell vs. Maundrell, 10 Ves. 260. Where the legal estate is in a trustee, as where there is an out *394 standing term, the purposes of which have been satisfied, the termor or his legal representative is made a trustee for creditors, and there the rule applies qui prior &c. But he adds “ it was very early decided, that if AandB advanced money innocently, and G bought also innocently, not having notice of each others advances, he who first had the luck to get the legal estate, had as good a right as any one; and should hold, by his legal title, the possession against the prior equities.”
With respect to the case of Martin & Walter vs. Evans, I think the conclusion still more palpable. In both the cases, the combination, as I have said, was to make the property sell higher than it would otherwise have done, for the satisfaction of creditors ; and it makes no difference that by the arrangement, some creditors were defeated, provided there was no fraudulent design or practice towards them; but by the judgment of the circuit court any imputation of a fraudulent design is disclaimed. The case differs from that of Hamilton, in that it does not appear that the complainants had any reason to believe that there were other incumbrancers who would bid up the property to secure their demands. They might not have known that the property would be sold on the day on which it was sold, but it was their business to attend to this.
I am of opinion, that the decree in the case of Hamilton vs. Hamilton should be affirmed, and in the case of Martin & Walter vs. Evans, reversed.
Johnston, Ch. and Evans, J. concurred,